UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CRIMINAL NO. | |
|---|---|---|---|
| | : | | |
| v. | : | VIOLATIONS: | |
| | : | | |
| | : | Counts 1-4: | 18 U.S.C. §§ 1343 & 2 |
| | : | | (Wire Fraud) |
| GARY T. JOHNSON | : | Counts 5-6: | 18 U.S.C. §§ 1957(a) & 2 |
| | : | | (Monetary Transaction in |
| | : | | Property Derived from |
| | : | | Specified Unlawful Activity) |

**INDICTMENT**

The Grand Jury charges:

**BACKGROUND**

The Defendant

1. **GARY T. JOHNSON** (hereinafter **JOHNSON**), the defendant herein, during the relevant times, resided and worked in Groton, Connecticut, including through a family run business known as Matrix Investment Corp. (hereinafter MATRIX or the Company), with its principal office in Groton, Connecticut. MATRIX provided mortgage loans to interested borrowers either as a broker for other lenders or as a loan originator itself. **JOHNSON** was the Chairman of MATRIX and oversaw lending activity at the Company.

The Victim Lenders

2. At all times relevant hereto, **Greenpoint Mortgage Funding, Inc. (Greenpoint** or **Greenpoint Mortgage)**, with offices in California and Massachusetts, among other locations, was a mortgage lender and provided direct loans to borrowers who were brought to it by interested brokers, such as MATRIX.

3. **Flagstar Bank**, with offices in Troy, Michigan, was a mortgage lender and provided a

warehouse line of credit to MATRIX to fund MATRIX's loans to borrowers.  **Flagstar Bank** would also, in certain instances, purchase identified mortgage loans that MATRIX had extended to borrowers.   At all times relevant hereto,  **Flagstar Bank** was a financial institution, namely, an insured depository institution under the Federal Deposit Insurance Act.

The MATRIX Loan Process

      4.   MATRIX was in the business of financing mortgage loans.  In certain instances, MATRIX would act as the broker between a borrower seeking financing and another lender. In those circumstances, MATRIX employees would typically prepare a loan application for the borrower based on information provided by the borrower or otherwise obtained by MATRIX.  If procedures were followed, MATRIX employees would forward the application and other relevant documents directly to the lender. The lender would impose certain conditions on extending the loan and, if such conditions were met, would extend the loan to be disbursed to the parties and others as identified on the relevant HUD statement.  With a refinancing, the loan would typically not be funded until three days after the closing date to permit the borrower the required period for recision of the refinancing agreement.

      5.   If MATRIX was to fund a mortgage loan to the borrower directly, rather than acting solely as a broker, MATRIX would take and evaluate the relevant loan application.   MATRIX would coordinate with one of its warehouse lenders to provide bridge financing for the loan under a line of credit.   MATRIX would  also typically simultaneously arrange for a lending institution to ultimately purchase the loan (the Purchasing Bank).  Certain warehouse lenders, such as **Flagstar Bank**, would require MATRIX to provide a commitment letter from the Purchasing Bank to buy the MATRIX-based loan before **Flagstar Bank** would extend the line of

credit to MATRIX to close the loan with the borrower. MATRIX and its borrower thus typically provided the Purchasing Bank with borrower-related information in order to obtain a commitment letter from the Purchasing Bank to purchase the yet-to-be-closed loan.

6. The warehouse lender and the Purchasing Bank thus depended on the accuracy of the borrower's loan application and other representations to determine whether to extend monies. If the standard procedures were followed, once the loan application process was complete and a commitment letter obtained from a Purchasing Bank, monies would be released from the warehouse lender to MATRIX at or about the date of closing (or three days after, in the case of refinancings) and MATRIX was to fund the mortgage loan consistent with the disbursements outlined in the HUD closing statement.

7. After the loan funding, the final closing package would be forwarded to the Purchasing Bank, and shortly thereafter, based on the prior commitment and additional representations, the Purchasing Bank would purchase the mortgage note from MATRIX and repay the warehouse lender. At times, the lender that extended the warehouse line of credit to MATRIX would itself, through a different department, purchase the mortgage note from MATRIX, credit MATRIX's warehouse line of credit, and keep the note in its loan portfolio. In those circumstances, the Purchasing Bank would be the owner of the mortage note given by the borrower, and the subsequent monthly mortgage payments would go to the Purchasing Bank.

Misallocation of Loan Monies

8. During the times relevant hereto, MATRIX and **JOHNSON** began to use monies disbursed by other lenders for purposes other than the payoffs set forth in the relevant HUD-1 statements, including to pay MATRIX's ongoing operating expenses or to make payoffs to other

lenders on unrelated refinancings. In or about the Summer of 2004, **JOHNSON** met with certain employees at MATRIX and informed them that he would be refinancings properties he purportedly owned, including his residence at 165 Tyler Avenue, Groton, Connecticut, and a separate property at 199 Thames Street, New London, Connecticut, to put money into the business to fund MATRIX. **JOHNSON** instructed a certain individual at MATRIX to locate lenders to fund the refinancings, which included preparing relevant loan applications.

### COUNTS ONE and TWO - Wire Fraud
18 U.S.C. § 1343

Scheme to Defraud **Greenpoint Mortgage**

9. Paragraphs 1-8 are incorporated by reference as if set forth in their entirety.

10. From in or about June 2004 through in or about November 2005, in the District of Connecticut and elsewhere, **JOHNSON**, the defendant herein, knowingly, willfully and with intent to defraud devised and intended to devise a scheme and artifice to defraud **Greenpoint Mortgage** and to obtain money and property from the lender by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is in substance set forth in ¶¶ 11-17 below.

11. On or about June 28, 2004, per **JOHNSON'**s instruction as noted above, a MATRIX employee began to seek refinancing options for **JOHNSON** from various lenders, including **Greenpoint,** for approximately $640,000 and a line of credit for $80,000, both to be secured by **JOHNSON**'s personal residence at 165 Tyler Ave., Groton, Connecticut. As part of the process, **JOHNSON** caused loan applications to be submitted to **Greenpoint**, among other lenders. **JOHNSON** had input on the content of the applications, and he reviewed and signed the preliminary applications, as well as the final form of the applications on or about the date of

closing, and prior to any receipt of funds.

12. In the application for the $640,000 loan, **JOHNSON** caused to be represented that 1) he would be the sole owner of the 165 Tyler Ave. property, his primary residence; 2) his base employment monthly income was $27,500; and 3) certain of his preexisting debts and mortgages would be paid off at closing, including the preexisting first mortgage on the Tyler Ave. property with Fremont Investment & Loan (Fremont) of approximately $541,500. **JOHNSON** further caused to be represented in the HUD-1 closing statement for the $640,000 loan, signed by him, that various debts were repaid, including the preexisting Fremont loan.

13. In the preliminary and final applications for the $80,000 line of credit, Johnson made the same representations that title to the subject property would be held in **JOHNSON**'s name and that his base employment monthly income was $27,500.

14. In truth and in fact, as **JOHNSON** well knew, the representations he made to **Greenpoint Mortgage**, noted above, were materially false and misleading in light of his failure to disclose to **Greenpoint** that 1) **JOHNSON** did not and would not have title, much less sole title, to the 165 Tyler Ave. residence at the time of the refinancing or thereafter; 2) he had materially overstated his monthly income on the loan applications; and 3) the prior first mortgage to Fremont was not repaid at closing or thereafter.

15. Both the $640,000 loan and the $80,000 line of credit closed on or about August 9, 2004, after **Greenpoint** obtained needed paperwork. **Greenpoint** extended the monies to the MATRIX client fund account at Washington Trust (Account # ****8083) for the refinancing on or about August 13, 2004, after the three day recision period. The monies were shortly thereafter disbursed to payoff other client financing unrelated to the subject loan, among other

items.

16.   On or about August 30, 2004, MATRIX submitted to **Greenpoint** a facsimile copy of the August 9, 2004 HUD settlement statement signed by **JOHNSON**, required by **Greenpoint** as part of the loan file.   Again this faxed settlement statement reconfirmed that disbursements had been made to pay off the prior first lien with Fremont, a representation which again was false and allowed **JOHNSON** to perpetuate his scheme.

17.   In or about the Fall of 2005, **JOHNSON** ceased making payments on the **Greenpoint**  loans, and those loans went into default, putting **Greenpoint** at substantial risk of loss and, in fact, **Greenpoint** has suffered substantial loss.

The Execution of the Scheme and Artifice to Defraud

18.   On or about the dates listed below, in the District of Connecticut and elsewhere, having devised and intended to devise a scheme and artifice to defraud the lender **Greenpoint Mortgage**, and for obtaining money and property from the lender by means of materially false and fraudulent pretenses, representations and promises as set forth in ¶¶ 9-17,  for the purpose of executing such aforementioned scheme and artifice, **JOHNSON** transmitted and caused to be transmitted by means of a wire and radio communication in interstate commerce, the following writings, signs, signals, pictures and sounds, namely, facsimiles from MATRIX in Connecticut to the mortgage processing units of **Greenpoint** outside of Connecticut, with each wiring constituting a separate Count of this Indictment as enumerated below:

| Count | Date of Wiring (on or about) | Origin of Wiring | Destination of Wiring | Item |
|---|---|---|---|---|
| 1 | August 9, 2004 | Conn. | Massachusetts | Fax (Loan Settlement Fee Agreement) from MATRIX to Greenpoint Mortgage to support the obtaining of the loans |
| 2 | August 30, 2004 | Conn. | Massachusetts | Fax (Settlement Statement) from MATRIX to Greenpoint Mortgage to support the extension of the loans |

All in violation of Title 18, United States Code, Sections 1343 & 2.

### COUNTS THREE and FOUR - Wire Fraud
18 U.S.C. § 1343
Scheme to Defraud **Flagstar Bank**

19. Paragraphs 1-8 are incorporated by reference as if set forth in their entirety.

20. From in or about June 2004 through in or about August 2005, in the District of Connecticut and elsewhere, **JOHNSON**, the defendant herein, knowingly, willfully and with intent to defraud devised and intended to devise a scheme and artifice to defraud **Flagstar Bank** and obtain money and property from the lender by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice, is in substance set forth in ¶¶ 21-25 below.

21. On or about September 28, 2004, **JOHNSON** caused a loan application, dated August 18, 2004, to be forwarded to **Flagstar Bank** in order for MATRIX to obtain warehouse funding from the bank to fund MATRIX's refinancing of an existing mortgage note held by **JOHNSON.** That existing mortgage note was secured by **JOHNSON**'s property at 199 Thames St., New London, Connecticut. The forwarding of the loan application began the process whereby **Flagstar Bank** would ultimately act as both the warehouse lender and the Purchasing

Bank, first by agreeing to fund the MATRIX warehouse line of credit and then by agreeing to purchase the mortgage note MATRIX would enter with **JOHNSON,** after MATRIX closed the requested mortgage loan with **JOHNSON. JOHNSON** had input on the content of the initial application and subsequent versions of the application and reviewed and signed the applications prior to their submission to **Flagstar Bank.**

22. In the various versions of the loan applications provided to **Flagstar Bank**, **JOHNSON** caused to be represented that 1) the residence securing the mortgage would be his primary residence; 2) his base employment monthly income was $29,000; 3) his existing liabilities were approximately $1,159,770; and 4) preexisting debts and mortgages on the 199 Thames St. property would be paid off totaling $489,126, including a loan from Washington Mutual ($271,678), the first lien holder, and an outstanding indebtedness to American Express ($99,746). **JOHNSON** also caused to be represented in the HUD-1 closing statement, dated October 8, 2004 and signed by **JOHNSON**, that various debts were to be repaid, including the preexisting mortgages held by Washington Mutual and American Express.

23. In truth and in fact, as **JOHNSON** well knew, the representations he made to **Flagstar Bank**, noted above, were materially false and misleading in light of his failure to disclose to **Flagstar Bank** that 1) **JOHNSON**'s primary residence was not and would not be 199 Thames St., New London; 2) he materially overstated his monthly income; 3) his liabilities were markedly understated, including failing to identify the approximately $720,000 in additional debt he had assumed with the **Greenpoint** loan; and 4) the preexisting loans with Washington Mutual and American Express were not repaid at closing or thereafter.

24. On or about October 15, 2004, **Flagstar Bank**, relying on representations made to it by **JOHNSON**, extended approximately $563,500 to MATRIX to fund MATRIX's mortgage loan to **JOHNSON**. On or about November 10, 2004, relying on **JOHNSON's** representations, **Flagstar Bank**, as the Purchasing Bank, acquired MATRIX's mortgage loan note with **JOHNSON** that was secured by the 199 Thames Street property and thereby reduced the outstanding line of credit MATRIX held with **Flagstar Bank** by an equivalent amount.

25. In or about August 2005, **JOHNSON** ceased making payments on the **Flagstar Bank** mortgage loan and subsequently defaulted on the loan, putting **Flagstar Bank** at substantial risk of loss and, in fact, **Flagstar Bank** has suffered substantial loss.

The Execution of the Scheme and Artifice to Defraud

26. On or about the dates listed below, in the District of Connecticut and elsewhere, having devised and intended to devise a scheme and artifice to defraud the lender **Flagstar Bank**, and for obtaining money and property from the lender by means of materially false and fraudulent pretenses, representations and promises as set forth in ¶¶ 19-25, for the purpose of executing such aforementioned scheme and artifice, **JOHNSON** transmitted and caused to be transmitted by means of a wire and radio communication in interstate commerce, the following writings, signs, signals, pictures and sounds, namely, computer communications and facsimile from MATRIX in Connecticut to the the mortgage processing units of **Flagstar Bank** outside of Connecticut, with each wiring constituting a separate Count of this Indictment as enumerated below:

| Count | Date of Wiring (on or about) | Origin of Wiring | Destination of Wiring | Item |
|---|---|---|---|---|
| 3 | September 28, 2004 | Conn. | Michigan | Fax from MATRIX of the August 18, 2004 loan application to Flagstar Bank |
| 4 | October 1, 2004 | Conn. | Michigan | Fax of the subsequent August 28, 2004 loan application to Flagstar Bank |

All in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNT FIVE -- Monetary Transaction in Property
Derived from Specified Unlawful Activity**
18 U.S.C. § 1957

27.     Paragraphs 1-18 are incorporated by reference as if set forth in their entirety.

28.     On or about August 4, 1998, MATRIX opened a Client Fund Account, Account Number ****8083, in the District of Connecticut at Washington Trust, a financial institution. At the times relevant hereto, the account statements were mailed to **JOHNSON's** home address at 165 Tyler Ave., Groton, Connecticut.

29.     Based on the fraud outlined above at ¶¶ 1-18, **Greenpoint Mortgage** forwarded loan proceeds of $721,109 ($640,409 and $80,700) on or about August 13, 2004, those monies obtained by fraud, to the MATRIX client fund account at Washington Trust.  Prior to the funds being deposited in the account, the account had a balance of approximately $405,167.  Shortly after the funds were deposited and on the same day, a total of approximately $555,379 was disbursed from the account to Liberty Title and Escrow through two wires, approximately $245,009 and $310,370.

30. In or about June 2004 and continuing to in or about the date set forth below as the date of the financial transaction, in the District of Connecticut and elsewhere, and corresponding specifically to the Count alleged below, **JOHNSON**, having instructed employees to refinance his properties to pay business expenses and aware of the standard MATRIX procedure in processing loan proceeds, did willfully cause and knowingly engage and attempt to engage in a monetary transaction, that is, a transfer of funds affecting interstate commerce by, through and to a financial institution, in criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, as set forth in Count One.

| Count | Date of Transaction (on or about) | Financial Institution Initiating Transaction | MONETARY TRANSACTION | AMOUNT (approximately) |
|---|---|---|---|---|
| 5 | August 13, 2004 | Washington Trust | The wire transfer from the MATRIX Client Fund Account at Washington Trust to Liberty Title & Escrow at Citizens Bank | $310,370 |

All in violation of Title 18, United States Code, Sections 1957(a) & 2(b).

### COUNT SIX -- Monetary Transaction in Property Derived from Specified Unlawful Activity
### 18 U.S.C. § 1957

31. Paragraphs 1-8, 19-26, and 28 are incorporated by reference as if set forth in their entirety.

32. Based on the fraud outlined above at ¶ 19-26, **Flagstar Bank** forwarded loan proceeds of $563,500 on or about October 15, 2004, those monies obtained by fraud, to the

MATRIX client fund account at Washington Trust. At the time the proceeds were deposited in the account, the account had approximately $189,404. Shortly after the funds were deposited, on or about October 18, 2004, approximately $562,500 was disbursed by wire to the Provident Bank.

33.   In or about June 2004 and continuing to in or about the date set forth below as the date of the financial transaction, in the District of Connecticut and elsewhere, and corresponding specifically to the Count alleged below, **JOHNSON**, having instructed employees to refinance his properties to pay business expenses and aware of the standard MATRIX procedure in processing loan proceeds, did willfully cause and knowingly engage and attempt to engage in a monetary transaction, that is, a transfer of funds affecting interstate commerce by, through and to a financial institution, in criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, as set forth in Counts Three and Four above.

| **Count** | **Date of Transaction (on or about)** | **Financial Institution Initiating Transaction** | **MONETARY TRANSACTION** | **AMOUNT (approximately)** |
|---|---|---|---|---|
| 6 | October 18, 2004 | Washington Trust | The wire transfer from the MATRIX Client Fund Account at Washington Trust to Provident Bank | $562,500 |

All in violation of Title 18, United States Code, Sections 1957(a) & 2(b).

                                                A TRUE BILL

                                    ___/s/_____
                                    FOREPERSON

UNITED STATES OF AMERICA

___/s/_____
NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

__/s/_____
ANTHONY KAPLAN
SUPERVISORY ASSISTANT
UNITED STATES ATTORNEY

_/s/_____
CHRISTOPHER W. SCHMEISSER
SENIOR LITIGATION COUNSEL